# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## July 20, 2010 Session

## STATE OF TENNESSEE v. ROBERT CHARLES TAYLOR

### Appeal from the Circuit Court for Coffee County
### No.  33,000    Charles Lee, Judge

---

### No.  M2010-00033-CCA-R3-CD - Filed September 15, 2010

---

Appellant, Robert C. Taylor, was indicted by the Coffee County Grand Jury for aggravated sexual battery.  After a jury trial, Appellant was convicted as charged and sentenced to twelve years in incarceration.  After the denial of a motion for new trial, Appellant sought an appeal.  On appeal, the following issues are presented for our review: (1) whether the evidence was sufficient to support the conviction; (2) whether the Appellant was denied the right to a speedy trial; (3) whether Appellant's due process rights were violated by the State's six-year delay in producing laboratory results and loss of evidence.  After a review of the record, we determine that Appellant was not denied a speedy trial and that Appellant's due process rights were not violated where there was no prejudice to Appellant.  Further, we determine that the evidence was sufficient to support the conviction.  Accordingly, the judgment of the trial court is affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.

JERRY L. SMITH, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Kevin R. Askren, Assistant Public Defender, Tullahoma, Tennessee, for the appellant, Robert Charles Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Mickey Layne, District Attorney General, and Jason Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

On August 22, 2003, Appellant was indicted for aggravated sexual battery. The case was originally set for trial on August 11, 2004. The trial was reset several times between August of 2004 and August of 2009. On July 29, 2009, Appellant filed a motion to dismiss for lack of a speedy trial and because a sleeping bag that was seized as evidence had been lost by the State. The trial court denied the motion after holding a hearing on the motion to dismiss prior to trial in which it determined: (1) that there was not an "intentional delay" by the State to gain a tactical advantage; (2) that the delay was not due to negligence; and (3) that Appellant acquiesced to the delay. Further, the trial court determined that Appellant was not prejudiced by the loss of evidence by the State because laboratory testing was completed on the evidence prior to the time that it was lost or misplaced.

At trial, the victim was identified as J.M.,[1] of Manchester. At the time of the incident, J.M. was eleven years old and lived with his grandmother. J.M. testified that he met Appellant at Sonic around September "[a]bout seven years" prior to the trial.

J.M. was described as having "mild mental retardation" and frequently left the house to roam around the neighborhood and community. J.M. often stayed at Wal-Mart until the police would come and take him home.

On the day that J.M. met Appellant, he was at Sonic trying to get a ride home. J.M. did not recall if Appellant approached him or if he approached Appellant. At some point, Appellant offered to give J.M. a ride home. When they got to the residence, J.M.'s sister was the only person at home. Appellant then drove J.M. and his sister to Edna Hickerson's house. Ms. Hickerson is a friend of J.M.'s grandmother. J.M. recalled that Appellant stayed with him for about four hours that evening but did not stay the night. J.M. thought that Appellant was a "pretty nice guy."

The next time Appellant and J.M. met, Appellant took J.M. to a gas station, to J.M.'s grandmother's house, and to Waffle House. After eating at Waffle House, Appellant took J.M. home. They played PlayStation games in the living room. J.M.'s sister was staying with her aunt that night.

---

[1] It is the policy of this Court to identify minor victims of sexual offenses by their initials.

After a while, Appellant told J.M.'s grandmother to go to sleep. When she went to bed, Appellant started to leave, but J.M. asked him to stay the night. Appellant said, "Sure." J.M. normally slept on the couch in the living room because he did not have a bedroom. Appellant got a sleeping bag out of the back of his car so that he and J.M. could sleep on the floor together. J.M. usually slept with his "clothes on."

J.M. remembered that Appellant told him to turn off the PlayStation and go to sleep. J.M. did not immediately comply, so Appellant threatened to leave. J.M. told him "no, you can stay." J.M. wanted Appellant to stay because he thought he was his friend.

J.M. eventually turned off the PlayStation and laid down on the sleeping bag to go to sleep. Appellant laid down "[r]ight beside" him. J.M. could not remember if they were wearing clothes. J.M. testified that Appellant started touching him on his "front." J.M. could not remember if the touching occurred on top of the clothes or under the clothes. J.M. asked Appellant what he was doing, and Appellant told him to "shut up." J.M. told Appellant that he could not tell him to shut up in his own house.

J.M. got up to go to the bathroom. Appellant followed him. J.M. could not remember if Appellant had on clothing but remembered that he had a blanket wrapped around his body. J.M. was unable to remember what happened in the bathroom. He explained that "some of that stuff [was] blocked off" in his memory.

The two left the bathroom and went back to the living room to lay down on the sleeping bag. Appellant told J.M. that he would take him to the flea market the next day. J.M. fell asleep and woke up when the police came to the house.

J.M.'s grandmother testified at trial. She confirmed that J.M. and his sister lived with her in May of 2003. She explained that J.M. would often wander out of the house to go "looking for friends." J.M. had been brought home by the police on more than one occasion.

J.M.'s grandmother remembered that J.M. met Appellant on a Wednesday and that the incident occurred on that Friday. The first time that Appellant drove J.M. home, his grandmother was standing outside talking to a friend who was a police officer. She commented to Appellant, "there is a cop right here and you had better watch yourself." Appellant laughed and told her he was the uncle of her own nephew. J.M.'s grandmother reasoned that if Appellant knew her nephew he must be okay.

On Friday of that week, Appellant brought J.M. home. Appellant gave J.M.'s grandmother fourteen dollars for a PlayStation controller, some gift cards from Sonic, and

a few discount cards for local stores.  Appellant told J.M.'s grandmother that his own children had been "ran [sic] over on the side of the road" and his nephew did not appreciate the gifts that he gave him so he was going to start giving gifts to J.M.

After being at the house for a while, J.M.'s grandmother watched J.M. and Appellant leave to go to Waffle House.  It was dark when they got back and Appellant told J.M.'s grandmother to go to sleep.  She had "accidentally" dozed off and decided to get some sleep.  J.M.'s grandmother went to her bedroom to go to sleep.

When J.M.'s grandmother woke up some time later, she heard Appellant and J.M. talking.  J.M.'s grandmother overheard Appellant telling J.M. that he would take him to the flea market "if he would not tell what they were doing . . . ."  J.M.'s grandmother testified that the tone of their voices let her know that "something bad was going on."  She was "terrified."  J.M.'s grandmother heard Appellant tell J.M. to shut up and J.M. told him that he could not tell him to shut up in his own house.

J.M.'s grandmother observed the Appellant and J.M. going to the bathroom together.  At the time, neither of them was wearing clothing.  They walked "right past"J.M.'s grandmother.  She testified that Appellant was leading J.M. by guiding him, "holding on to each side of his body" from behind.

J.M.'s grandmother was unable to call for help because she did not have her phone.  She left her bedroom while they were in the bathroom together and hid in the kitchen.  J.M.'s grandmother waited until they came back into the living room.  At that time, she snuck out of the house, woke up her neighbors, and called the police.

When police arrived, J.M.'s grandmother was outside.  She led officers into the house where Appellant and J.M. were in a sleeping bag on the living room floor.  Appellant was lying on his stomach with pants and no shirt.  Appellant claimed he "didn't do nothing."

Appellant was interviewed by the police.  The next morning, J.M.'s grandmother found Appellant's underwear in the living room under a chair.  She turned them over to the police along with a pillow and sleeping bag.

Officer John Krause of the Manchester City Police Department responded to the call.  When he arrived at the house, he entered the living room to see Appellant and J.M. asleep on the floor of the living room.  Appellant was wearing pants with no shirt and J.M. was wearing underwear.

Investigator Herbert Ray "Butch" Stewart talked with both J.M. and J.M.'s grandmother as part of the investigation. In J.M.'s grandmother's statement, she stated that she saw Appellant and J.M. walking to the bathroom in their underwear. In a different portion of his report, Investigator Stewart had written that J.M.'s grandmother saw both J.M. and Appellant naked. He could not explain the discrepancy.

Appellant agreed to go to the police station for an interview. Appellant never admitted that he touched J.M. According to Appellant, he had been in Manchester at a pub and was drinking with some friends. When he left, he went to give some video games to J.M. Appellant could not explain why he was at Appellant's house so late at night or why he was sleeping with J.M. on the floor. Appellant was released at the end of the interview.

The sleeping bag and Appellant's underwear were sent to the TBI laboratory for examination. Semen was found on the sleeping bag, but it did not match the DNA of Appellant or J.M.

At the conclusion of the proof, Appellant was convicted of aggravated sexual battery. Appellant subsequently filed a motion for a new trial, in which he alleged that the evidence was insufficient, Appellant's due process rights were violated when the State withheld exculpatory evidence and lost evidence, and Appellant was denied a speedy trial. The trial court denied the motion for new trial. Appellant filed a timely notice of appeal.

*Analysis*

*Speedy Trial*

Appellant complains that the trial court erred in granting a motion to dismiss for lack of a speedy trial. Appellant concedes that his attorney "consented to . . . continuances as a strategy to negotiate a concurrent sentence" but that if the State had divulged the exculpatory evidence about the DNA on the sleeping bag, the "trial strategy would have been considerable [sic] different." The State contends that Appellant agreed to the continuances and has failed to show that he demanded a speedy trial or that he suffered prejudice as a result of the delay in the trial.

The United States and Tennessee Constitutions guarantee the criminal defendant the right to a speedy trial. U.S. Const. amend VI; Tenn. Const. art. I, § 9; *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). The right to a speedy trial is also statutory in Tennessee. *See* T.C.A. § 40-14-101.

When an accused seeks the dismissal of charges based upon the denial of the constitutional right to a speedy trial, the accused must establish a period of delay that is "presumptively prejudicial." *State v. Jefferson*, 938 S.W.2d 1, 12 (Tenn. Crim. App. 1996) (citing *Doggett v. United States*, 505 U.S. 647, 651 (1992); *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). The length of the delay is dependent upon the peculiar circumstances of each case, and the delay that can be tolerated for "an ordinary street crime" is generally much less than for a serious, complex felony charge. *Barker*, 407 U.S. at 530-31. A delay of one year or longer marks the point at which courts deem the delay unreasonable enough to trigger further inquiry. *Doggett*, 505 U.S. at 652 n.1; *Utley*, 956 S.W.2d at 494. If this threshold is crossed, a balancing test determines the merits of the speedy trial issue. In *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn. 1973), the Tennessee Supreme Court recognized and adopted the balancing test the United States Supreme Court set forth in *Barker* in which four factors must be balanced. The factors are: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to speedy trial; and (4) the prejudice resulting from the delay. *Barker*, 407 U.S. at 530-32; *Bishop*, 493 S.W.2d at 83-84.

We now turn to the facts of this case. There is no question that there was a delay of nearly six years between the time that Appellant was indicted and the trial. Clearly, this length of time triggers an inquiry to implement the balancing test. The reason for the delay appears to be that the case was repeatedly continued. There is no evidence of malicious intent on the part of the State. In fact, Appellant acquiesced to the continuances to secure a deal with the State for either a plea or to ensure that any potential sentence received would run concurrently with an existing sentence. Throughout the delay there is no evidence in the record that Appellant ever raised the issue until July 29, 2009. "[T]he failure to demand a speedy trial is not a waiver of the right, but is one of the factors to be considered in the ultimate decision . . . ." *Bishop*, 493 S.W.2d at 84. Finally, we look at the prejudice resulting from the delay. Appellant argues that he was prejudiced because he did not receive the DNA report until July 15, 2009. Appellant was not precluded from using these results at trial. After weighing the factors announced in the balancing test, we conclude that there has not been a denial of Appellant's Sixth Amendment right to a speedy trial. Therefore, Appellant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Appellant complains on appeal that the evidence is insufficient to support his conviction for aggravated sexual battery. Specifically, Appellant complains that there was no proof in the record that the touching described by the victim was "for the purpose of sexual arousal or gratification." The State, on the other hand, argues that sufficient evidence was produced at trial to establish Appellant's guilt.

-6-

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the "State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions of witness credibility, the weight and value of evidence, and resolution of conflicts in the evidence are entrusted to the trier of fact. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).

Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant . . . accompanied by any of the following circumstances: . . . (4) The victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). Sexual contact includes "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . ." T.C.A. § 39-13-501(6). Intimate parts includes "the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2).

The evidence introduced at trial, in a light most favorable to the State, established that J.M. was eleven years old at the time that he met Appellant. According to J.M., Appellant was at his house when he "starting touching" him on the penis. J.M. did not remember if Appellant touched him through his underwear or directly on his penis. Further, J.M. did not even recall if he was wearing his underwear at the time. J.M. testified that he blocked out some portions of that day from his memory. J.M. remembered that he asked Appellant why he was touching him and Appellant instructed him to "shut up." Mrs. Metcalfe overheard this exchange and testified that she saw Appellant leading J.M. into the bathroom by the hips and that they were either partially clothed or naked at the time.

Appellant argues that there was no proof the touching was for sexual arousal or gratification. Intent is almost always proven circumstantially. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973). This Court has held that direct evidence of the circumstances surrounding the offending behavior, such as "the location of the events, the state of dress of the defendant and the victim, and how the physical contact occurred" can establish a defendant's intent. *See, e.g. State v. Hayes*, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995) (holding evidence sufficient to establish aggravated sexual battery where defendant had attempted to kiss the victim and later touched the victim's breast and the clothing over her breast while he was wearing underwear and victim's mother was away from the house). The facts herein are similar. J.M. and Appellant were sleeping on a sleeping bag in the living room after Appellant asked Mrs. Metcalfe to go to bed. Then Appellant touched J.M.'s penis and told J.M. to shut up when J.M. asked what he was doing. We conclude that the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the touching was intentional and for the purpose of sexual arousal or gratification. Thus, the evidence was sufficient to convict Appellant and Appellant is not entitled to relief on this issue.

*Due Process*

Appellant argues that his due process rights under the Fourteenth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution were violated when the State withheld the results of the DNA testing on the sleeping bag for nearly six years. Additionally, Appellant claims that his rights were violated when the State lost or destroyed the sleeping bag and underwear that contained exculpatory evidence. The State disagrees, arguing that because Appellant was able to utilize the DNA results at trial, there was no prejudice, and Appellant's rights were not violated.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial.[2] To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 110-11 (1976).

---

[2] "As a general rule, . . . a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." *State v. Ferguson*, 2 S.W.3d 912, 914 n.3 (Tenn. 1999) (citing *Betts v. Brady*, 316 U.S. 455 (1942); *Watkins v. State*, 393 S.W.2d 141, 144 (Tenn. 1965); *Lofton v. State*, 898 S.W.2d 246, 248 (Tenn. Crim. App. 1994)).

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to establish a due process violation under *Brady*, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). *Brady* does not require the prosecution "to disclose information that the accused already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Edgin*, 902 S.W.2d at 389.

This Court has stated that in order to establish a *Brady* violation, the information need not be admissible, only favorable to the defendant. *See State v. Spurlock*, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)). This Court will deem evidence material if a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 682 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

In this case, the State did not withhold the evidence from Appellant but delayed the dissemination of information about the evidence for a lengthy period of time. A delay in the disclosure of exculpatory evidence requires a somewhat different analysis. In order to determine if the failure to provide the evidence affected the defendant, the inquiry is whether

the delay prevented the defense from effectively preparing for and presenting the defendant's case. *See State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993). "Only if the suppression prevents material exculpatory evidence from effectively being used at trial is there a due process violation." *Id.*

In the case herein, Appellant's due process rights were not violated by the length of delay between the State's seizure of the sleeping bag and the release of the results of the DNA testing. Appellant was able to use the information at trial, even employing a special agent forensic scientist to testify. Appellant has not identified any way in which he was prejudiced by the delayed disclosure of the evidence.

Appellant also argues that his due process rights were violated by the State's loss or destruction of the sleeping bag and underwear. The State has a general duty to preserve all evidence subject to discovery and inspection as part of Tennessee Rule of Criminal Procedure 16. The case of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), illustrates the procedure to examine situations in which the State fails to preserve evidence. In *Ferguson*, the defendant was arrested for DUI. The videotape of various sobriety tests performed by the defendant was inadvertently taped over before his trial. *Ferguson*, 2 S.W.3d at 914. The defendant appealed, arguing that the State violated his Due Process rights by failing to preserve the videotape. In its review of defendant's issue, our state supreme court adopted a test for courts to use in determining whether the loss or destruction of evidence has deprived a defendant of a fair trial. *Id.* at 917. The initial analytical step in this test for determining whether there was any duty to preserve evidence was described as follows:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). The Court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." *Id.* Accordingly, those factors include: "(1) The degree of negligence involved; (2) The significance of the destroyed evidence, considered in light of the probative value and

reliability of secondary or substitute evidence that remains available; and (3) The sufficiency of the other evidence used at trial to support the conviction." *Id.* at 917. "If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges." *Id.* However, dismissal is but one of the trial judge's options. *Id.*

In the case herein, at the pretrial motions hearing, the trial court determined that the physical absence of the sleeping bag was not "of importance" here. The trial court pointed out that the item of importance was "what was on the sleeping bag" and "that evidence has been preserved and will be available to the defendant to present to the jury for their consideration." In other words, the trial court determined that there was no prejudice in the "unavailability" of the sleeping bag. We agree. The *Ferguson* factors weigh in favor of the State. Appellant has failed to show that there was some negligence on the part of the State in the loss of the sleeping bag. Further, the DNA results were available to Appellant, so the significance of the lost or destroyed evidence was minimal. Finally, there was ample evidence separate and apart from the sleeping bag used to convict Appellant. The trial court properly determined Appellant's due process rights were not violated. Appellant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE